351 So.2d 133 (1977)
STATE of Louisiana
v.
John DEFRANCES.
No. 59846.
Supreme Court of Louisiana.
October 10, 1977.
*134 Sam N. Gregorio, Gregorio & Frazier, Shreveport, for defendant-relator.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Jr., Dist. Atty., James M. Bullers, Asst. Dist. Atty., 26th Jud. Dist., Bossier and Webster Parishes, for plaintiff-respondent.
DIXON, Justice.
This case involves a challenge of the constitutionality of R.S. 14:104, keeping a disorderly place, based on the contention that the statute is void-for-vagueness.
Two indictments were filed against John Defrances both charging violation of R.S. 14:104. The indictments stemmed from an investigation which, the State contends, produced evidence of B-drinking and lewd dancing in two lounges located in Bossier City, Louisiana. Defendant filed motions to quash the indictments alleging the failure to properly indict, the failure to state essential facts constituting the offense charged, and the unconstitutional vagueness of R.S. 14:104. The trial judge granted the motion to quash based on the allegation that the indictment failed to conform to C.Cr.P. 464 because it merely stated a conclusion of law without setting forth the essential facts constituting the offense, and ordered the State to so amend the indictment. The other two motions were denied. Application for writ of certiorari was granted by this court. State v. Defrances, 346 So.2d 214 (La.1977).
Defendant contends that R.S. 14:104, insofar as it makes criminal maintaining a place to be used habitually for "any immoral sexual purpose" is unconstitutionally vague.
R.S. 14:104 provides in part:
"Keeping a disorderly place is the intentional maintaining of a place to be used habitually for any illegal purpose or for any immoral sexual purpose."
R.S. 14:104 was amended to its current form in 1948 after this court's decision in State v. Truby, 211 La. 178, 29 So.2d 758 (1947), declaring unconstitutional that part of R.S. 14:104 which defined the crime of keeping a disorderly place as the "intentional maintaining of a place to be used habitually for any illegal or immoral purpose." The court held that the words "immoral purpose" were vague, indefinite and uncertain, recognizing that it left to the courts the determination of its meaning in any given case, which determination could vary from locality to locality.
In response to Truby, the statute was amended by substituting for the words "for any illegal or immoral purpose" the words "for any illegal purpose or for any immoral sexual purpose" (emphasis added). The effect of the addition of this language in more clearly defining the prohibited conduct has not heretofore been determined.
The United States Supreme Court has enunciated values out of which the void-forvagueness doctrine, based upon the due process clause of the Fourteenth Amendment to the United States Constitution, arose:
"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, *135 where a vague statute `abut[s] upon sensitive areas of basic First Amendment freedoms,' it `operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to `steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." Grayned v. City of Rockford, 408 U.S. 104,108-09, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222, 227-28 (1972). (Footnotes omitted).
The same protection is provided an accused under Article 1, § 13 of the Louisiana Constitution, which states that "[i]n a criminal prosecution, an accused shall be informed of the nature and cause of the accusation against him." Jurisprudence has recognized that ". . . this guarantee requires that penal statutes describe the unlawful conduct with sufficient particularity and clarity such that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto." State v. Lindsey, 310 So.2d 89, 90 (La.1975). See also Connick v. Lucky Pierre's, 331 So.2d 431, 434 (La.1976).
The State contends that the words "any immoral sexual purpose" sufficiently defines the prohibited conduct, and in oral argument before this court asserted that there is a general understanding of the meaning of these words.
We do not agree that the phrase "immoral sexual purpose" has a generally accepted meaning such that a person of ordinary intelligence would be given fair notice of what conduct is forbidden,[1] or that "sexual" has sufficiently delimited the word "immoral" so as to pass constitutional muster.
Louisiana, in adopting a mode of statutory construction, has struck a middle ground between strict and liberal constructionism. R.S. 14:3, regarding interpretation, provides:
"The articles of this Code cannot be extended by analogy so as to create crimes not provided for herein; however, in order to promote justice and to effect the objects of the law, all of its provisions shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision."
Twenty-nine years ago, at the time R.S. 14:104 was amended, what was considered "sexually immoral" perhaps had a generally accepted meaning to the population as a whole. However, with the passage of time, and an increasingly more liberal sexual standard, what may have been considered to fall clearly within the scope of sexually immoral conduct may no longer be interpreted as such by a substantial segment of the population. For example, an embrace between young lovers in public may have been "sexually immoral" and shocking to many almost thirty years ago, but today it would hardly cause a raised eyebrow. Forty years ago ballroom dancing was prohibited as "immoral" at any college function by the trustees of Centenary College, just *136 across the river from defendant's establishment. Sexual mores change with the times, and achieving a consensus of meaning becomes exceedingly more difficult.
Thus a court today, in applying 14:104, is put in the position of having to determine for itself the standard of guilt in a given situation. This clearly goes beyond giving a statute its "genuine construction" but enters the area of creating crimes that are not specifically provided for by statute and infringing on what is reserved as a legislative function.
When the Louisiana Criminal Code was enacted in 1942, and after the 1948 amendment, R.S. 14:104, keeping a disorderly place, and 14:105, letting a disorderly place, appeared to be intended as a prohibition against the keeping or letting of what were commonly known as "bawdy houses," or houses of prostitution. If there still are such places, it is clear that they would be covered by the language "immoral sexual purposes." The danger lies in the potential of this language encompassing certain activity that most would agree is generally not considered to constitute criminal activity. For example, the owners of certain establishments are not informed by 14:104's language as to whether the following activity is prohibited: (1) owners of "swinging singles" apartment complexes; (2) owners of places where sparsely-clad "go go dancers" perform; (3) apartment building owners who rent to unmarried couples who cohabit; (4) owners of bars and lounges that provide comfortable surroundings to accommodate patrons "making out;" (5) owners of bars and lounges where customers engage in the current dance crazes, such as "the bump" which is suggestive of sexual intercourse. The foregoing activity, which might annoy some and shock others, could hardly have been what the legislature had in mind when it was aiming to control the proliferation of bawdy houses. Nevertheless, some law enforcement personnel could construe this conduct as "sexually immoral" and subject otherwise innocent individuals to criminal prosecution. Leaving the definition function to the courts tends to promote the kind of arbitrary and discriminatory enforcement the due process clause sought to protect against. A person of ordinary intelligence must be better informed than he is at present under R.S. 14:104 of conduct which crosses the line from non-criminal to criminal; it is a legislative function to draw the line distinctly.
Reference to statutes in other jurisdictions is helpful to show that the conduct sought to be prohibited may be expressed in clearer, more narrowly drawn language so as to conform to constitutional standards.[2] (Broad language is not in itself vague, particularly where it is clear that the legislature intended to make criminal all acts of a certain kind. See the comprehensive theft (R.S. 14:67) and gambling articles (R.S. 14:90) which make criminal all unauthorized takings of the property of another, and all gambling-as-a-business. "Any immoral sexual purpose," to be generally understood, must be interpreted to refer to all sexual purposes except private activity between lawfully married couples pertaining to procreation. No one would argue such a legislative intent).
*137 The State cites cases where certain statutes, which had been amended through addition of the word "sexual," withstood voidfor-vagueness attacks to show that R.S. 14:104 is similarly definite. State v. Roth, 226 La. 1, 74 So.2d 392 (1954); State v. Fulmer, 250 La. 29, 193 So.2d 774 (1967); State v. Willis, 253 La. 893, 221 So.2d 39 (1969).
In Roth the constitutionality of part of the obscenity statute, R.S. 14:106(2), after it was amended by addition of the word "sexually" to delimit "indecent," was upheld. However, the invalidity of the Roth decision was clear after the United States Supreme Court's decision in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), which set out constitutional standards for obscenity statutes. See State v. Christine, 239 La. 259, 118 So.2d 403 (1960); State v. Shreveport News Agency, 287 So.2d 464 (1973); State v. Gay Times, 294 So.2d 496 (1974).
Fulmer, supra, and Willis, supra (which affirmed Fulmer) also should not control. At issue there was whether, in R.S. 14:92(7) (contributing to the delinquency of juveniles), the phrase "perform any sexually immoral act" was sufficiently specific, the court having previously held that "perform any immoral act" was too indefinite. Relying wholly upon State v. Roth, supra, (which has not survived the development of obscenity laws), this court held, in Fulmer, that "perform any sexually immoral act" had an accepted meaning, generally understood. (This is not to indicate that R.S. 14:92(7) is unconstitutionally vague today, for it can be read to mean that all sexual acts performed with a child under seventeen are criminal).
Therefore, we hold that the portion of R.S. 14:104 dealing with maintaining of a place to be used habitually for "any immoral sexual purpose" is unconstitutionally vague. That part involving "any illegal purpose" is clear and definite, since the word "illegal" means "contrary to some criminal statute of this state" or "violative of some criminal statute," and thus leaves nothing for the court to define. State v. Truby, supra, at 760.
Defendant, in an additional assignment of error, alleges that the indictment under which he was charged is defective in that the language used does not track the language of the statute and therefore the State should be required to amend the indictment to conform thereto. Our disposition of the case on the question of constitutionality pretermits the necessity for any comment on this allegation.
For the reasons assigned, the ruling denying the motion to quash is reversed, and the case is remanded to the trial court for further proceedings consistent with the views expressed herein.
SANDERS, C. J., dissents with written reasons.
SUMMERS, J., dissents.
MARCUS, J., concurs.
SANDERS, Chief Justice (dissenting).
I cannot agree that the words "any immoral sexual purpose" in the context of the statute are so vague as to render the statute unconstitutional. In my opinion, the principles announced in State v. Willis, 253 La. 893, 221 So.2d 39 (1969); State v. Fulmer, 250 La. 29, 193 So.2d 774 (1967); State v. Roth, 226 La. 1, 74 So.2d 392 (1954); and State v. Rose, 147 La. 243, 84 So. 643 (1920), require that the court uphold the constitutionality of the statute.
Apart from the decisions of this Court, the authorities generally agree that the words "immoral sexual purpose" have a commonly understood meaning and that they are not constitutionally void for vagueness. See Morrow, The Generality of Immorality in Louisiana, 21 Tul.L.Rev. 545, 549 (1947); Louisiana Legislation of 1948, 9 La.L.Rev. 47; Note, 8 La.L.Rev. 129 (1947).
For the reasons assigned, I respectfully dissent.
NOTES
[1] This court, in State v. Carpenter, 319 So.2d 355 (La.1975), in relying upon a dictionary definition, held that the word "hunting" had a clearly definable meaning and thus the statute in which it was contained was not unconstitutionally vague. Due to the word's accepted meaning, the accused would be informed of the nature and cause of the accusation against him and would be afforded fair notice of the conduct proscribed by the statute. The same cannot be said about the word "sexual" whose dictionary definition adds little illumination and is still subject to varying interpretations. "Sexual" is defined as follows:

"1. Pertaining to or associated with sex; as sexual differentiation; specif.; pertaining to sex as concerned in reproductive processes; as, the sexual instinct or impulse.
2. Pertaining to the sexes; particular to, or relating to, either the male or female or their distinctive organs or functions. 3. Pertaining to the use or abuse of sex functions, appetites, etc.; as, sexual morality.
4. Biol. Having sex; opposed to asexual." Webster's New International Dictionary, Second Edition, Unabridged (1953).
"Morals refers to generally accepted customs or conduct and right living in a society, and to the individual's practice in relation to these; the morals of our civilization." The American College Dictionary, Random House.
It therefore becomes necessary for the courts to decide what acts should be deemed to constitute the offense, a function more properly belonging to the legislature.
[2] See, e. g., Cal.Penal Code § 316 (West):

"Keeping disorderly houses. Every person who keeps any disorderly house, or any house for the purpose of assignation, or prostitution, or any house of public resort, by which the peace, comfort, or decency of the immediate neighborhood is habitually disturbed, or who keeps any inn in a disorderly manner; and every person who lets any apartment or tenement, knowing it is to be used for the purpose of assignation or prostitution, is guilty of a misdemeanor."
Ark.Stat.Ann. § 41-3207:
"Abatement as public nuisance. The operation of a house of ill fame, a bawdy house, a disorderly house or any house for the purpose of assignation or prostitution in this state to which men and women resort for the purpose of prostitution or lewdness, is hereby declared to be a public nuisance, detrimental to public morals and may be abated under the present provisions of law for the suppression of public nuisances."
(Texas, in enacting its new penal code in 1973, chose to repeal its very specific and detailed statute on "keeping a bawdy or disorderly house." See Texas Former Pen.Code Ann. arts. 510, 511, 513, 514).